# Audrey M. Daitchman v. Murray Daitchman

[483 A.2d 270]

No. 83-142

Present: Hill, Underwood and Gibson, JJ., and Barney, C.J. (Ret.), and Daley, J. (Ret.), Specially Assigned

Opinion Filed September 14, 1984

146

*Bernard Lisman* and *Michael Marks* of *Lisman & Lisman,* Burlington, for Plaintiff-Appellee.

*Peter F. Langrock* and *Donald C. Arbitblit* of *Langrock Sperry Parker & Wool,* Middlebury, for Defendant-Appellant.

**Barney, C.J.** (Ret.), Specially Assigned. When the plaintiff was a college student she met and married the defendant, then pursuing rabbinical studies. Some twenty-nine years later, children grown, the parties' divorce case was heard and went to final judgment. An earlier hearing had been carried through almost to final entry, but was aborted when the presiding judge recused himself. On that account the litigation has therefore already consumed more than five years.

Two questions are raised on appeal. One relates to a decision by one of the assistant judges not to disqualify herself, and the second deals with the only issue relative to the divorce —the division of the marital property.

■ The disqualification issue need not detain us. Nothing in the record presented suggests that there was any impropriety in Assistant Judge Wheel's determining, on the basis

of her own responsibility, the issue of her own recusal. Nor does there appear in any affirmative form, the slightest evidence that she could not, or did not, pass upon the facts of this case without bias or prejudice, as is the test of *Leonard* v. *Willcox*, 101 Vt. 195, 215, 142 A. 762 (1928). Her brief appearance as a spectator in the courtroom at an earlier hearing before other judges certainly does not rise to the level of prejudicial participation.

Turning now to the larger question of the property settlement, some history, as revealed in the record, is necessary to a full understanding of the arguments.

The findings report that, at marriage, the defendant had no real assets and plaintiff's father gave financial assistance while the defendant was completing his education. At a time when defendant was employed as principal of a religious school in Wilkes-Barre, Pennsylvania, the plaintiff's father, Barney Magram, asked the couple to return to Burlington so that the defendant could become involved in the operation of the store, Magram's, The Fashion Shop, Inc. The defendant had worked at the store previously as a stockroom employee during summer vacations.

When they returned to Burlington in 1958, the defendant began work full time at a salary about twenty-five percent less than his position as principal paid. However, the couple lived with the plaintiff's parents and received free room and board. At the time, Barney Magram was having serious health problems requiring periodic hospitalization. As a result, defendant became increasingly involved in managing the store, taking over the retail operations altogether by 1963.

The defendant proved to be a good manager and the store prospered. From 1958 to 1978, the year the defendant's tenure ended through discharge, annual retail sales grew from $500,-000 to $10,000,000. Many innovations and forward-looking mercantile practices were introduced by the defendant, increasing sales and streamlining operations. Other outlets were opened in Plattsburg and Glens Falls, New York.

Not all of the defendant's activities were solely for the benefit of the store, however. He made contributions to charity from company funds, received kickbacks from the charities, but never accounted for or returned the money to the store. He and a third party, acting on their own, leased a portion

of Magram property and operated a ladies clothing store, an action not in the best interests of Magram's. The plaintiff was led to believe the shop was part of the Magram's operation. Actions were taken and loans made without the consent of the board of directors. An agreement was entered into to purchase a store in Massachusetts which, when it came to the attention of the directors, was rejected, and which required Magram's to pay a substantial sum to terminate the agreement to purchase entered into by the defendant.

Defendant's salary increased during his tenure, presumably in recognition of Magram's growth. In 1968 his salary was almost $25,000, in 1977–78 $86,675 and in 1978 $91,000. In addition he received fringe benefits in the form of medical insurance, clothing allowance, travel reimbursement and participation in a pension plan.

In his last year with Magram's, 1978, he procured the preparation and execution of a five-year employment contract with the corporation which guaranteed him a percentage of gross sales of the business. Plaintiff, who by then was president of the corporation, signed it without reading it, because she trusted defendant and was accustomed to signing documents at his request without question. That contract is now in litigation in the United States District Court where he seeks $1,000,-000 in damages for breach of that employment agreement.

In 1969 plaintiff's father, Barney Magram, died. Prior to his death he had made a gift to the couple of 75 shares of Magram Corporation stock, which had a market value of $92,900 as of the date of the separation of the parties. The Magram's operation consisted of two corporations, Magram's, The Fashion Shop, Inc., the retail business organization, and Magram Corporation, the real estate holding company that holds ownership of the business premises. Barney Magram's will gave the plaintiff controlling interest in the Fashion Shop stock, with a minority interest to her sister, Louise Weiner. He left a controlling interest in Magram Corporation to Louise, with a minority interest in the plaintiff.

Since his discharge in 1978 defendant has found employment in retail merchandising. He is currently living and employed in a store in Ithaca, New York, where his salary is $27,000 plus fringe benefits, he having refused a proffered

cost of living raise. The trial court found his true earning capacity to be $100,000 a year.

: During his married life three extramarital affairs are acknowledged. He is currently living in Ithaca with the third, she now being employed in the same store where he is. Based on this evidence one of the grounds for granting this divorce was stated to be adultery.

Plaintiff, until the break-up of the marriage, was unaware of the defendant's activities, and believed she had a perfect marriage. She dedicated herself to the defendant and their children and was dominated by him. She has been a faithful wife and good mother. The shock of the break-up brought on depression to the plaintiff and changed her from a vivacious and sociable person to one more reclusive.

In 1974 defendant owned assets in his sole name in the amount of $46,500. Eight years later his assets exceeded $270,000 in value. In 1981 and 1982 the defendant's total income was about $46,000. Besides his salary he received in 1981 interest income of $6,910 and dividend income of $11,320. His gross income referred to above was tax sheltered to the amount of $6,650. He has a $10,000 liability for legal fees.

The value of assets owned by the plaintiff, including the stock worth $1,000,000 received from her father's estate, amount to $1,137,300. The parties own a home, built on land given by the plaintiff's father, encumbered by a mortgage of less than $4,000. Although the testimony placed the value of the home in a range between $125,000 and $160,000, the trial court made no finding as to its worth. The plaintiff's income in 1981 amounted to $60,706 of which $38,883 is earned income from employment in Magram's. While the parties lived together the plaintiff's income was used for household expenses, including groceries. Her income is still used for her living expenses. She also pays the taxes on the residence which she still occupies. The house needs major repairs.

The lower court disposed of the parties' assets by its order that essentially left each party with the assets standing in his or her own name, with two additional provisions. One gave the house to the plaintiff, the other required the plaintiff to pay the defendant $46,450 for his half interest in the 75 shares of jointly owned Magram stock. Assuming that the value of

that stock is accurate, the second provision does not inequitably affect either party.

The attention of the defendant is focused on the other parts of the distribution which he says are so out of balance that they violate the provisions of 15 V.S.A. § 751. He complains further that the trial court never made a finding as to the value of the jointly owned residence decreed to the plaintiff. His claim of an inequitable distribution is supported, he contends, by the fact that the plaintiff, under the order, receives assets valued at $1,137,300 plus the residence, while he receives only $272,324. Thus, on the face of it, it appears that the court gave the plaintiff an award about five times that of the defendant. As we stated in *Hendrick* v. *Hendrick*, 142 Vt. 357, 360, 454 A.2d 1251, 1252 (1982), this justifies a close look to determine that the legislative injunction under 15 V.S.A. § 751 to divide and assign the property equitably has been carried out, having in mind the factors the legislature considered relevant as well as other appropriate equitable concerns reserved by the legislative notation that its listing of relevant factors was not a limitation.

■ Reviewing the disposition by the court it can readily be seen that each party was left in possession of his or her personal assets as listed in the findings, except that the residence was given to the plaintiff. The testimony reveals that the parties differed in its value by twenty-five to thirty-five thousand dollars, with the plaintiff claiming it to be worth $125,000 and the defendant $150,000 to $160,000. If the court's failure to make a finding is irretrievable here, and contributes to an unfair award, reversal will be necessary. However, if the award as made, including the house valued at the defendant's own figure, is supportable, the error can be treated as harmless under the standards of V.R.C.P. 61. *Morris* v. *American Motors Corp.*, 142 Vt. 566, 577, 459 A.2d 968, 974 (1982).

It is apparent that the alleged discrepancy between the plaintiff's and defendant's assets as retained under the order derives entirely from the inheritance by the plaintiff of her share of her father's estate. Without that, the shares look like this: the plaintiff's assets at $137,300 plus the residence at $160,000 equals $297,300; the defendant's assets total $272,324. This is a variation from equality of $12,488 for each party. Thus, for

purposes of justifying the variation from equality, the issues relating to the defendant's entitlement to any share of that inheritance are the critical questions of the appeal. Perhaps it should be noted here, although it hardly needs stating, that equality is not necessarily equity, when the circumstances of the parties are taken into account, as they must be.

The defendant advances three arguments to support his right to share in the inheritance. First, he contends that he is entitled to recognition for his contribution to the appreciation in value of Magram's stock through his managerial expertise. Second, he argues that the plaintiff is not entitled to standing as "the party through whom the property was acquired" in the language of 15 V.S.A. § 751(b)(10). Third, he argues that the trial court improperly based the award to the plaintiff upon corporate activities of the defendant which caused little or no depreciation of marital assets.

■ These contentions all ignore the meaningful expression of legislative concern in 15 V.S.A. § 751(b)(12): "the respective merits of the parties." This is not a "no-fault" divorce; the decree is grounded on adultery, and, in that respect, is unchallenged. The findings, also unchallenged, report that situation to be frequent, long-standing and continuing, without the knowledge of the plaintiff. The statute is designed to call the court's attention to the fact that the award should take into account the equities as measured in connection with the parties' conduct during coverture. The factual situation is poles apart from the situation in *Emmons* v. *Emmons*, 141 Vt. 508, 450 A.2d 1113 (1982), and the trial court's findings and order properly reflect it. See *Jackson* v. *Jackson*, 139 Vt. 548, 551, 432 A.2d 1181, 1182 (1981).

■ There is no question but what, if it chose to do so, the trial court could have given recognition to the fact that the size of the plaintiff's inheritance was undoubtedly enhanced by defendant's managerial skills. However, it must also be noted that the results achieved were, in business terms, already compensated to him under his employment arrangements. He has no claim on the distribution to plaintiff's sister, and, had Barney Magram survived the marriage, no claim there. Recognition of his efforts is not mandated, but permitted, if such

recognition aids the court in its overall duty of equitable disposition of marital property. It was not error for it to reject the contention here in the light of the defendant's conduct.

■ The defendant somehow finds in *Colm* v. *Colm*, 137 Vt. 487, 407 A.2d 184 (1979), support for a claim that it was improper for the court below to give any attention to the fact that the stock inherited by the plaintiff came to her as a bequest from her father. All that *Colm* speaks to, having in mind it was dealing with property given jointly to the parties, is reflected in this paragraph:

> Even more important, the statute instructs the judge to have regard for the source of the property, not as the single, or by any means governing, consideration in decreeing the property. It also subjects it to concerns about the respective merits of the parties, to the condition in which each will be left by the divorce, to the burdens imposed for the benefit of the children, as well as general justice and equity. In the face of all these concerns the fact that the property was decreed to a party not one through whom the property was acquired is not an automatic demonstration of disregard of the statute. *Culver* v. *Culver*, 133 Vt. 191, 193–94, 332 A.2d 799 (1975). The discretion accorded the court is wide, not to be overturned without a showing of abuse or withholding of that discretion. *LaFarr* v. *LaFarr*, 132 Vt. 191, 193, 315 A.2d 235 (1974). No such showing has been made.

*Id.* at 491, 407 A.2d at 186.

■■ Just so here. Nothing amounting to an abuse of discretion, in the light of the evidence, has been demonstrated in this case. The defendant goes on to fault the trial court for reciting evidences of corporate misbehavior by the defendant without finding any loss to the corporation. He challenges these findings as irrelevant and improper. It is clear from the evidence that most, if not all, of these actions took place while the plaintiff was president of the company and reflect a part of the pattern of self-aggrandizement and deception practiced on her by him. They represent no ground for reversal and undergird the trial court's assessment of the respective merits of the parties. In spite of all this, the defendant emerges from this

divorce with his personal assets intact. Under the circumstances, he has no grounds for complaint.

*Judgment affirmed.*